NOT DESIGNATED FOR PUBLICATION

No. 111,738

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PRESTON E. SANDERS,
*Appellant*.


MEMORANDUM OPINION

Appeal from Logan District Court; GLENN D. SCHIFFNER, judge. Opinion filed September 4, 2015. Affirmed in part and remanded with directions.

*Michelle Davis* and *Kimberly Streit Vogelsberg*, of Kansas Appellate Defender Office, for appellant.

*Amanda G. Voth*, assistant solicitor general, and *Derek Schmidt*, attorney general, for appellee.


Before GREEN, P.J., HILL, J., and TIMOTHY G. LAHEY, District Judge, assigned.


*Per Curiam*: Preston Sanders appeals his jury trial convictions of one count of aggravated human trafficking, one count of transporting an open container, one count of furnishing alcohol to a minor, and one count of driving while suspended. On appeal, Sanders argues that he should have been charged with promoting prostitution rather than aggravated human trafficking, that the State presented insufficient evidence, that the trial court should have instructed the jury on the word "used," and that the trial court imposed an illegal sentence. We affirm Sanders' convictions but remand for resentencing.

1

On December 30, 2011, Officer Douglas Reed stopped Preston Sanders' car for speeding. Officer Reed discovered that Sanders' license was suspended so he arrested him. A young woman was also in the car with Sanders. While speaking with the young woman, Officer Terry Grace noticed that the young woman smelled of alcohol. Officer Grace then learned that the young woman's name was A.M.M. and that she was not quite 18 years old. Officer Grace then gave A.M.M. a breath alcohol test which showed A.M.M.'s blood alcohol level at .30. Officer Grace then took A.M.M. into police protective custody.

After finding an open bottle of tequila in Sanders' car Officer Reed cited Sanders for transporting an open container in addition to furnishing alcohol to a minor. Officer Reed also discovered that Sanders had an outstanding warrant in Minnesota.

It was later determined that Sanders' warrant was for a probation violation matter. On December 16, 2011, while Sanders was on probation in Minnesota, Sanders was arrested in Iowa and Iowa issued a warrant for him based on his felony charge of pimping. The Iowa case involved a prostitution sting where Officer Warren Steinkamp, an Iowa police officer, arrested both A.M.M. (who was using the working name of Tiffany Champagne) and Sanders.

After investigating Sanders' case, the State of Kansas eventually charged Sanders with one count of aggravated human trafficking, a severity level 1 person felony; one count of transporting an open container, an unclassified nonperson misdemeanor; one count of furnishing alcohol to a minor, a class A person misdemeanor; and one count of driving while suspended, a class B nonperson misdemeanor.

At trial, Sanders conceded to all of the traffic offenses and only contested the charge of aggravated human trafficking. The jury convicted Sanders on all counts. Sanders moved for a directed verdict arguing that the State failed to present sufficient

2

evidence that Sanders knew A.M.M. would be used for the sexual gratification of another. The trial court denied Sanders' motion for a directed verdict.

At sentencing, the trial court granted a downward durational departure and imposed a controlling 147 months in prison. The trial court also ordered Sanders to register as a sex offender under KORA. Although the presentence investigation report indicated that Sanders' postrelease term should be 36 months, the State argued that Sanders should actually receive lifetime postrelease. The trial court ordered Sanders to lifetime postrelease.

*Is Promoting Prostitution the More Specific Offense Over Aggravated Human Trafficking?*

In his first issue on appeal, Sanders maintains that his conduct was prohibited by both the more general aggravated human trafficking statute and the more specific promoting prostitution statute. As a result, Sanders argues that the court can only enter a conviction for promoting prostitution because it is the more specific offense.

The rule that a general statute should yield to a more specific statute covering the same criminal conduct involves the examination of legislative intent to determine which statute the legislature intended to be applied in each particular case. See *State v. Williams*, 299 Kan. 911, 930, 329 P.3d 400 (2014); *State v. Cott*, 288 Kan. 643, 645, 206 P.3d 514 (2009). "Interpretation of a statute is a question of law, and an appellate court's standard of review of a lower court's statutory interpretation is unlimited." 288 Kan. at 645. Because this rule hinges on legislative intent, it should not apply when "there is a clear indication that the legislature did not intend for one statute to be the exclusive mechanism for punishing a given activity." *State v. Helms*, 242 Kan. 511, 514, 748 P.2d 425 (1988).

Although Sanders did not raise this argument before the trial court, our court has jurisdiction to address it. In *Williams*, our Supreme Court held that this issue may be raised for the first time on appeal because it involves only a question of law and that it could be determinative of the case. 299 Kan. at 929.

In this case, Sanders argues that based on the facts of this case, promoting prostitution is the more specific offense that should have been charged. Sanders maintains that there is insufficient evidence to support the control and exploitation element of aggravated human trafficking, and therefore, promoting prostitution should apply instead.

Aggravated human trafficking is defined in K.S.A. 2011 Supp. 21-5426(b)(2) as follows:

> "(b) Aggravated human trafficking is:
>
> . . . .
>
> (2) recruiting, harboring, transporting, providing or obtaining, by any means, a person under 18 years of age knowing that the person, with or without force, fraud, threat or coercion, will be used to engage in forced labor, involuntary servitude or sexual gratification of the defendant or another."

Promoting prostitution is defined in K.S.A. 2011 Supp. 21-6420 as follows:

> "(a) Promoting prostitution is knowingly:
>
> . . . .
>
> (7) procuring transportation for, paying for the transportation of, or transporting a person within this state with the intention of assisting or promoting that person's engaging in prostitution."

Last year, in *Williams*, our Supreme Court examined these two statutes to determine whether promoting prostitution was the more specific offense. In *Williams*, the defendant recruited and transported a 15-year-old girl from Kansas to Texas to be a prostitute for him. Before leaving Kansas, the defendant refused to let the girl call her roommate or pick up her belongings because he was afraid she would change her mind. The defendant told the girl that she could not look at any other man, that she was to look down, and that she should not speak unless she was spoken to or unless he gave her permission to speak.

When they arrived in Texas, the girl performed oral sex on the defendant at his request because she felt as if she had no choice in the matter. The defendant then sent the girl out on the street with rates and a quota that she had to reach before she was allowed to return to the hotel. The girl had to give almost all of her profits to the defendant and she only ate when the defendant brought her food. The girl testified that she agreed to work as a prostitute because she felt she did not have any other choice and that she knew what she was getting herself into.

The *Williams* court held that the legislative intent is clear in that it did not intend "to have promoting prostitution control over aggravated trafficking." 299 Kan. at 930. Our Supreme Court determined that the legislature intended for the aggravated trafficking statute to cover a wide range of activities because trafficking offenses are part of a larger set of crimes. 299 Kan. at 931-32. The *Williams* court further determined that the legislature intended the aggravated trafficking statute to apply in situations "in which a minor's vulnerability is exploited through an abuse of power—*i.e.*, where the minor is 'used.'" 299 Kan. at 923.

Thus, because the defendant in *Williams* exerted a high level of control over his 15-year-old victim and sexually exploited her vulnerability, the defendant's conduct was

5

broader than the narrow scope of the promoting prostitution statute. *Williams*, 299 Kan. at 932.

Sanders attempts to distinguish his facts from the facts in *Williams* to show why promoting prostitution should apply in his case. For example, Sanders maintains that he did not exert as much control over A.M.M. as the defendant in *Williams*. Sanders also points out that A.M.M. began prostituting herself out before she had even met Sanders. Sanders further argues that A.M.M. was older than the victim in *Williams*, that she had been legally emancipated, and that she was old enough to consent to sexual relationships in Kansas. Sanders also makes note of the fact that A.M.M. recruited Sanders into her escort business and that she continued to prostitute herself out even after Sanders was in custody.

Nevertheless, Sanders ignores many facts which support charging him with aggravated trafficking over promoting prostitution. The facts in this case show that, just as in *Williams*, Sanders' conduct went beyond the behaviors targeted by the promoting prostitution statute and fit better under the aggravated trafficking statute. For example, the record shows that Sanders was the mastermind behind the escort business. Sanders was the one who reserved the hotel rooms, purchased the cell phones, told A.M.M. where to go and where not to go, and he also made a large amount of money from trafficking A.M.M. Additionally, Sanders admitted to his probation officer that he had been in the escort business since he was 16 years old and that he was addicted to that lifestyle because of the fast money. Sanders also referred to a hotel room as his "office" and he flaunted the cash that A.M.M. brought in.

Sanders' control over A.M.M. was extremely evident once he was in prison. Even from prison, Sanders told A.M.M. what to do. Sanders controlled or directed A.M.M. on how to handle the money and was constantly telling her not to spend any money. Also from prison, Sanders told A.M.M. to put up her prostitution advertisements and told her

6

how to do it. He encouraged her to work more and often told her that she had not worked enough. Sanders also told A.M.M. to give his sister the money she was making, and A.M.M. obeyed. Sanders then instructed his sister to not give A.M.M. any money if she came and asked for some until she checked with Sanders first. He then told his sister that he did not think she would do that because he knew how loyal A.M.M. was to him. Sanders also threatened to kill A.M.M. multiple times in one of their phone conversations while he was in prison. A.M.M. testified that she did not remember this comment and did not take him seriously; however, Sanders said that he meant what he said during their phone conversation.

Also, A.M.M.'s mother told Officer David Stokes that Sanders had been prostituting A.M.M. since she was 15 years old and that A.M.M. was being threatened by Sanders through his family while he was in prison.

Based on this evidence, it is clear that Sanders exercised a level of control over A.M.M. that would not have been captured under a promoting prostitution charge. For example, promoting prostitution only requires that the person be transported within the State of Kansas. Here, Sanders had taken A.M.M. to Minnesota, Iowa, Illinois, and Missouri, and they were on their way to California. Clearly Sanders was not merely transporting A.M.M. within the State of Kansas for the sole purpose of A.M.M. prostituting herself out. Thus, under the facts of this case, we conclude that promoting prostitution was not the more specific offense and conclude that Sanders was properly charged with aggravated trafficking.

*Was There Sufficient Evidence to Convict Sanders of Aggravated Human Trafficking?*

Next, Sanders argues that there was insufficient evidence to convict him of aggravated human trafficking. Specifically, Sanders contends that there was insufficient evidence that Sanders "used" A.M.M. as required by statute.

7

When reviewing the sufficiency of the evidence in a criminal case, because the jury has found the facts in the State's favor, we review the evidence in the light most favorable to the State to determine whether a rational factfinder could have found the defendant guilty beyond a reasonable doubt. *State v. McBroom,* 299 Kan. 731, Syl. ¶ 5, 325 P.3d 1174 (2014). We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses. 299 Kan. 731, Syl. ¶ 5. Nor do we make a distinction between direct and circumstantial evidence in terms of probative value: "A conviction of even the gravest offense can be based entirely on circumstantial evidence and the inferences deducible therefrom. If an inference is a reasonable one, the jury has the right to make the inference." 299 Kan. 731, Syl. ¶ 6.

Sanders challenges the sufficiency of the evidence for his conviction for aggravated human trafficking, which is defined in K.S.A. 2011 Supp. 21-5426(b)(2) as "recruiting, harboring, transporting, providing or obtaining, by any means, a person under 18 years of age knowing that the person, with or without force, fraud, threat or coercion, will be used to engage in forced labor, involuntary servitude or sexual gratification of the defendant or another." In this case, the jury was instructed that the State had to prove the following elements:

"1. The defendant transported [A.M.M.] by any means.

"2. [A.M.M.] was less than 18 years old.

"3. The defendant knew that [A.M.M.], with or without force, threat or coercion, would be used for sexual gratification of another.

"4. This act occurred on or about the 30th day of December, 2011, in Logan County, Kansas."

Sanders asserts that the State failed to present sufficient evidence to prove that he used A.M.M. because the State did not present evidence of Sanders' exploitation of A.M.M.'s vulnerability through an abuse of power.

8

To support his argument, Sanders points out that the *Williams* court held that the term "used" in the aggravated trafficking statute indicates the statute is limited to situations where a minor's vulnerability is exploited through an abuse of power. 299 Kan. at 921-22. Sanders maintains that there is insufficient evidence that he exploited A.M.M.'s vulnerability. In fact, Sanders urges the court to find that A.M.M. looked at Sanders more as a "business partner or mentor rather than a controlling or exploitative pimp." Sanders stresses the fact that when the offense occurred, A.M.M. was 2 months from being 18 years old; that A.M.M. was legally emancipated in Minnesota; that A.M.M. had previously been tried as an adult in Iowa; and that A.M.M. was old enough to consent to sexual relationships in Kansas. Sanders argues that A.M.M. began prostituting on her own so any involvement he might have had was secondary. Sanders further contends that although A.M.M. had a tattoo of Sanders on her arm, which is often a sign of branding, Sanders also had a tattoo of A.M.M. on his body. Thus, this should be viewed as a genuine sign of affection rather than a sign of ownership or control.

While there are some facts that support Sanders' argument, there are also facts that support the jury's finding that Sanders used A.M.M. for sexual gratification of another. For example, Sanders reserved the hotel rooms that A.M.M. would use for prostitution; Sanders purchased and provided A.M.M. with cell phones to use for her prostitution; Sanders posted A.M.M.'s prostitution advertisements and encouraged A.M.M. to also post these advertisements; A.M.M. had to have Sanders' permission to give clients extra time or to charge extra money; and even from prison, Sanders was still telling A.M.M. how much to work and where to work and encouraging her to give him the money she had made. Sanders also admitted to his probation officer that he was addicted to the fast cash that a person can make in the escort business and that he had been involved in that business since he was 16 years old. Simply, Sanders used A.M.M. as a tool to make money. Indeed, A.M.M. is how Sanders made a living. Sanders bragged about the large amount of money he made in the escort business and even took pictures of himself with large amounts of cash.

Based on the evidence presented in the case, the jury found that Sanders used A.M.M. in a way that exploited her vulnerability. Viewing the evidence in the light most favorable to the State, as we are required to do, a reasonable jury could hold that Sanders exploited A.M.M.'s vulnerability through an abuse of power. Sanders transported A.M.M. when she was under the age of 18, knowing that she would be used for the sexual gratification of another; thus, he was guilty of aggravated human trafficking.

*Did the Trial Court Err in Failing to Define the Term "Used" for the Jury?*

Next, Sanders argues that the trial court erred in failing to define the term "used" in the aggravated human trafficking instruction. Sanders maintains that without a definition of the term "used" the instruction failed to inform the jury of the limitations of the statute. Sanders contends that if the court had defined the term "used," then there is a real possibility that the jury would have reached a different verdict.

Under K.S.A. 22-3414(3), even when a defendant fails to object to or request an instruction, we may examine the issue using the clearly erroneous standard of review. The clearly erroneous standard of review employs a two-step process as provided in *State v. Smyser*, 297 Kan. 199, 204, 299 P.3d 309 (2013):

> "First, the appellate court must 'determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.' *Williams*, 295 Kan. 506, Syl. ¶ 4. If the court finds error, it moves to the second step and 'assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.' *Williams*, 295 Kan. 506, Syl. ¶ 5."

In this case the jury was instructed as follows:

10

"1. The defendant transported [A.M.M.] by any means.

"2. [A.M.M.] was less than 18 years old.

"3. The defendant knew that [A.M.M.], with or without force, threat or coercion, would be used for sexual gratification of another.

"4. This act occurred on or about the 30th day of December, 2011, in Logan County, Kansas."

Sanders maintains that the jury should have been instructed that the term "used" meant "exploited through an abuse of power."

It should be noted that the standard PIK instruction was used in this case. Although the use of PIK instructions is not required, it is strongly recommended, as these ""instructions have been developed by a knowledgeable committee to bring accuracy, clarity, and uniformity to jury instructions."' [Citation omitted.]" *State v. Acevedo,* 49 Kan. App. 2d 655, 663, 315 P.3d 261 (2013), *rev. denied* 300 Kan. 1104 (2014).

The term "used" is not statutorily defined, nor is a definition provided in the Pattern Instructions for Kansas (PIK). See K.S.A. 2011 Supp. 21-5426(b)(2); PIK Crim. 54.450. Nevertheless, our Supreme Court discussed the definition of the term "used" as it relates to this instruction in the *Williams* case. The *Williams* court noted that although the statute does not give a specific definition for the term "used," the court held that "the word's context makes its meaning clear, and its meaning limits the scope of K.S.A. 21-3447(a)(2). Specifically, the phrase 'used to engage in forced labor, involuntary servitude or sexual gratification' indicates the statute is limited to situations where a minor has been exploited." 299 Kan. at 921. The *Williams* court cited Webster's II New College Dictionary in defining "use" as follows: "'[t]o put to some purpose' and '[t]o exploit for one's own advantage or gain.'" 299 Kan. at 921. The *Williams* court further found that the jury could have inferred the victim was used by the defendant in a manner the legislature determined should be punished as aggravated trafficking. 299 Kan. at 933.

11

As in *Williams*, the jury could have inferred that A.M.M. was used by Sanders in a way that the legislature determined should be punished as aggravated human trafficking. For example, Sanders was clearly the one in charge. Sanders reserved the hotel rooms that A.M.M. would use for prostitution; Sanders purchased and provided A.M.M. with cell phones to use for her prostitution; Sanders posted A.M.M.'s prostitution advertisements and encouraged A.M.M. to also post these advertisements; A.M.M. had to have Sanders' permission to give clients extra time or to charge extra money; and even from prison, Sanders was still telling A.M.M. how much to work and where to work and encouraging her to give him the money she had made. Sanders clearly used A.M.M. as a tool to make money.

The meaning of the word "used" in the statute and jury instruction is clear. The word "used" is widely used and has a common meaning. Thus, there was no need for the court to instruct the jury on the word "used." As a result, Sanders has failed to meet his burden of proof to show clear error. Moreover, based on the facts in this case, the jury could have inferred that A.M.M. was "used" by Sanders in a way that is punishable as aggravated human trafficking.

*Is Sanders' Sentence of Lifetime Postrelease Illegal?*

Finally, Sanders argues that the trial court ordered an illegal sentence when it imposed lifetime postrelease. Sanders maintains that his sentence does not conform to the provisions in K.S.A. 2011 Supp. 22-3717, and therefore, the sentence should be vacated and remanded.

> "An illegal sentence under K.S.A. 22-3504(1) is a sentence imposed by a court without jurisdiction; a sentence which does not conform to the statutory provision, either in the character or the term of the punishment authorized; or a sentence which is

12

ambiguous with respect to the time and manner in which it is to be served." *State v. Ballard,* 289 Kan. 1000, Syl. ¶ 11, 218 P.3d 432 (2009).

An illegal sentence may be corrected at any time. K.S.A. 22-3504. Whether a sentence is illegal within the meaning of K.S.A. 22-3504 is a question of law over which an appellate court has unlimited review. *State v. Trotter,* 296 Kan. 898, 902, 295 P.3d 1039 (2013).

The State concedes that Sanders should have been sentenced to 36 months postrelease instead of lifetime postrelease and the State also requests that the sentence be vacated and remanded for resentencing.

K.S.A. 2011 Supp. 22-3717(d)(1) states that a person sentenced for a crime committed on or after July 1, 1993, subject to subparagraph (G), will be subject to postrelease for 36 months, if sentenced for a severity level 1 felony. K.S.A. 2011 Supp. 22-3717(d)(1)(A).

K.S.A. 2011 Supp. 22-3717(d)(1)(G) states that persons convicted of a sexually violent crime committed on or after July 1, 2006, must be released from prison to lifetime postrelease. K.S.A. 2011 Supp. 22-3717(d)(2) sets forth the applicable sexually violent crimes. Aggravated human trafficking was not added to the list of sexually violent crimes until 2013. See K.S.A. 2013 Supp. 22-3717(d)(5)(K).

Sanders was convicted of a severity level 1 felony offense for a crime he committed on December 30, 2011. Thus, he should have been sentenced to 36 months postrelease instead of lifetime postrelease. As a result, we remand this case to the trial court to resentence Sanders to 36 months' postrelease.

Affirmed in part and remanded for resentencing.